**In the Matter of Geneva BRUCE, Bankrupt.**

**BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY, Plaintiff,**

v.

**Geneva BRUCE, Defendant.**

**Bankruptcy No. 78 B 3500.**

United States Bankruptcy Court, N. D. Illinois, E. D.

Feb. 27, 1980.

Alan Kawitt, Chicago, Ill., for debtor.

Shari R. Rhode, Carbondale, Ill., for plaintiff.

## OPINION AND ORDER

RICHARD L. MERRICK, Bankruptcy Judge.

This cause comes on to be heard upon a motion for summary judgment of the Board of Trustees of Southern Illinois University that the student loan debt owed to it by Geneva Bruce be held non-dischargeable under Section 17a of the Bankruptcy Act.[1] The reasoning of the opinion will go somewhat beyond the contentions of the parties in their pleadings, arguments and briefs in

1.  11 U.S.C. § 35a.

order that the principles enunciated here may serve as a basis for decision in other student loan dischargeability proceedings under the same and other federal student loan programs which are pending before this court. The facts in the case are not in dispute and follow the common familiar pattern of other student loan cases around the country; the details will be described after a general discussion of the nature of the broad problem and the approaches made to its solution by other courts.

## STUDENT LOAN PROGRAMS

Of a wide variety of federally supported student assistance programs for veterans and non-veterans there are two which are of particular significance to bankruptcy courts because of the frequency with which the former students have sought to have their loans discharged in bankruptcy proceedings:

(a) direct loans under the National Defense Education Act of 1958,[2] and

(b) insured or guaranteed loans under the Higher Education Act of 1965, Part B.[3]

A brief description of those two assistance programs may facilitate an understanding of the decisions which have been reported to date and of the wide variation in the results in those cases. The National Defense Education Act in broad terms provided that educational institutions or their affiliates or foundations could create funds of which 10% of the capital had been supplied by the institution and 90% by the federal government to make student loans on a revolving basis at 3% interest repayable in equal annual installments over ten years, with repayment commencing nine months after the student ceased receiving one-half of normal full time instruction. Repayment could be delayed for up to three years because of service in the Armed Forces, the Peace Corps or Vista.[4] Up to 50% of the debt could be cancelled by teaching in needy schools. The debt was cancelled by the death or permanent disability of the former student.

Part B of the Higher Education Act of 1965 established a more comprehensive program which has had a broader impact because the annual funding has been six times as large as that of the direct National Defense loan program. The principal distinguishing feature between Higher Education Act, Part B loans and those granted as National Defense Student loans is that the latter were direct loans by an educational institution or an affiliate, whereas the Higher Education Act, Part B loans originally followed the format of unsecured personal loans by banks, savings and loan associations, credit unions, and other commercial institutions at a 7% interest rate and guaranteed or insured by the federal government. Repayment began from nine months to one year after cessation of at least half of full-time instruction and had tolling features similar to those of the direct loans. The guaranteed loans also were cancelled by death or permanent disability of the former student. The following tables demonstrate one of the reasons that certain of the courts have felt that the student debts were contingent and unascertainable. The tables show the percentage of the debt which would be cancelled by employment in the respective types of teaching or service in the Armed Forces.

2. 20 U.S.C. § 401 et seq.

There were also direct loans, similar in most respects, under Part E of Title IV of the Higher Education Act of 1965. (20 U.S.C. § 1088 et seq.)

3. 20 U.S.C. § 1071 et seq.

4. No attempt has been made to identify precisely which contingency features were added by:

Education Amendments of 1976 (20 U.S.C. § 1001 et seq.)
Health Professions Educational Assistance Act of 1976 (42 U.S.C. § 294 et seq.)
Higher Education Act of 1965 (20 U.S.C. § 1001 et seq.)
Economic Opportunity Act of 1964 (42 U.S.C. § 2902).

CANCELLATION OF DEBT FOR SERVICE

TEACHING

| | Elementary School | Pre-School | Handicapped School | Members of Armed Forces |
|---|---|---|---|---|
| 1st year | 15% | 15% | 15% | 12½% |
| 2nd year | 15 | 15 | 15 | 12½ |
| 3rd year | 20 | 15 | 20 | 12½ |
| 4th year | 20 | 15 | 20 | 12½ |
| 5th year | 30 | 15 | 30 | – |
| 6th year | – | 15 | – | – |
| 7th year | – | 10 | – | – |
| Maximum | 100% | 100% | 100% | 50% |

A loan which came into default for non-payment would have to remain in default for 120 days before application could be made by the lender for reimbursement by the federal government upon its loan or guarantee. A feature of the guarantee which has caused the intermediate state authorities to increase their collection efforts against defaulted loans is that the federal government reimbursed 100% of the defaulted debt if the losses of that authority were 4% or less; 90% of the defaulted debt if the losses were between 5% and 9%; and 80% of the defaulted debt if the losses were above 9% of the debt then subject to repayment.

In 1976 § 439 of the Higher Education Act of 1965 (as amended, hereinafter § 439A)[5] was amended to provide that on and after September 30, 1977, loans that were insured or guaranteed would not be dischargeable in bankruptcy for five years after repayment of the loan became due, except for reasons of undue hardship on the former student or his dependents. That non-dischargeability feature did not apply to direct loans made under the National Defense Education Act (except in the Northern District of Ohio[6]). Before considering the impact of that amendment upon insured and guaranteed loans we will consider loans of that type up to September 29, 1977 and direct loans up to September 30, 1979.

For bankruptcy purposes, student loans were essentially the same as any other unsecured debt until September 29, 1977 for insured and guaranteed loans and until September 30, 1979 for direct loans. The problems which will be discussed in this opinion relate largely to the status of insured and guaranteed loans from September 30, 1977 to November 6, 1978, and from November 6, 1978 to August 14, 1979, focusing on the issue of dischargeability of such debts. The provability and allowability issues remained constant throughout.

PROVABILITY AND ALLOWABILITY

The leading case for the proposition that a student loan is not dischargeable because it is not provable is *New York v. Wilkes*,[7] in which the reasoning was:

1. § 17 of the Bankruptcy Act provides in part:
   "a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part . . .[8];

2. § 63 of the Bankruptcy Act provides in part:
   "a. Debts of the bankrupt may be proved and allowed against his estate which are founded upon . .

5. 20 U.S.C. § 1087–3.

6. *State of Ohio, Ohio Student Loan Commission v. James Gregory Vittek*, 5 B.C.D. 429 (N.D.Ohio 1979).

7. 41 N.Y.2d 655, 394 N.Y.S.2d 849, 363 N.E.2d 555 (1977).

8. 11 U.S.C. § 35a.

(8) contingent debts and contingent contractual liabilities." [9]

3. § 57 of the Bankruptcy Act provides in part:

"d. Claims which have been duly proved shall be allowed . . . Provided, however, That an unliquidated or contingent claim shall not be allowed unless liquidated or the amount thereof estimated in the manner and within the time directed by the court; and such claim shall not be allowed if the court shall determine that it is not capable of liquidation or estimation or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this Act." [10]

4. § 63 of the Bankruptcy Act also provides in part:

"d. Where any contingent or unliquidated claim has been proved, but, as provided in subdivision d of section [57] of this Act, has not been allowed, such claim shall not be deemed provable under this Act.[11]

The New York Court of Appeals reasoned that the debt which was owed by Wilkes could not be ascertained as a definite amount because nothing would be payable if the student should die or become permanently disabled and also because portions of the debt might be cancelled if he should become a teacher in areas specified as being needy; there was no telling whether he would teach, and if so, where and for how long. The court found that the amount of the debt could not be ascertained nor estimated and held the debt not to be dischargeable because not provable and allowable. *Wilkes* was followed by a District Court in *Mills*.[12] *Wilkes* was followed in *Evans*[13] and *Kirch*[14] by Bankruptcy Courts.

*In re Crisp*,[15] with opinion written by Judge Augustus Hand, is the most respected of the rebuttals of *Wilkes*, with somewhat different facts but the same principles. Crisp was a poor person who had incurred hospital expenses of $10,180.82 in a Connecticut hospital. A Connecticut statute required hospital billing to be based upon ability to pay, and Crisp was billed $1,623.65, which he later sought to have discharged in bankruptcy. The statute provided also that there could be additional billings up to the total expense in the event that the former patient should become able to pay more in the future. The Court found the debt provable under § 63a(4) of the Bankruptcy Act as an open account and as an obligation based upon an implied contract. A number of bankruptcy court cases have followed similar reasoning, including *Hayman*,[16] *Jones*,[17] *Mwongozi*,[18] *Thomas*,[19] *Vittek*,[20] and *Woodard*.[21] *In re Mwongozi* has received the most critical acclaim. § 63a(1) has been mentioned several times as a satisfactory conduit, and *Woodard* found that as a claim for anticipatory

9. 11 U.S.C. § 103a.

10. 11 U.S.C. § 93d.

11. 11 U.S.C. § 103d.

12. *Board of Regents of the University System of Georgia v. John Cutter Mills*, Dist.Ct. (S.D. Ga.) Sept. 23, 1977, Bkcy. No. 177–154.

13. *Thomas Jefferson University v. Richard A. Evans*, 4 B.C.D. 793 (E.D.Pa.1978).

14. *State of Ohio v. Bruce Jeffrey Kirch*, 4 B.C.D. 680 (S.D.Ohio, 1978).

15. *State of Connecticut v. Leonard Crisp*, 521 F.2d 172 (2 Cir. 1975).

16. *Arthur J. Hayman v. Wilmington Trust Company and United Student Aid Fund*, 4 B.C.D. 932 (S.D.Fla.1978).

17. *University of Cincinnati v. Colleen Jones*, 5 B.C.D. 593 (S.D.Ohio 1979).

18. *State of Oregon v. Pamela Wyvette Mwongozi*, 4 B.C.D. 120 (D.Ore.1978).

19. *Daeman College v. Sharon Ann Thomas*, 4 B.C.D. 796 (W.D.N.Y.1978).

20. Op. cit. note 6, supra.

21. *Vermont Student Assistance Corporation v. Judith Jessie Woodard*, 15 C.B.C. 729 (D.Vt. 1978).

breach of an executory contract the debt was provable under § 63a(9).

In every instance the loan is evidenced by one or more promissory notes, and the amount currently owed is specific. The only questions which are open are:

1. Will the debt be cancelled because of death or permanent disability?;

2. Will the repayment period be extended because of specified charitable or military service?; and

3. Will a portion or all of the debt be cancelled by actual teaching in specified needy areas or by military service?

*Maynard v. Elliott*[22] is frequently quoted as standing for the proposition that the amount of certainty is a matter of degree and that the courts should lean toward the debtor.

This Court feels that the reason that other courts go around in circles trying to break the dischargeability-provability-allowability ring is that they fail to recognize that two completely different concepts have been welded into the same hoop. Dischargeability is a debtor-creditor relationship; provability and allowability are creditor-creditor relationships. Dischargeability relates to a potential payment some time in the future. Provability and allowability relate to an immediate distribution of the liquid assets in a bankrupt's estate.

The purpose of bankruptcy law is to provide equal distribution of the bankrupt's assets among his creditors. Claims must be established (proven) in a specified manner and within a reasonable time (allowed) so that the total divisor may be known and divided into the pool of assets to produce a *pro rata* distributable amount for each proven and allowed claim.

Discharge is virtually unrelated to proof and allowance. It was introduced in 1705[23] as an adjunct to awards to debtors whose estates produced specified amounts. The awards were to act as incentives to the debtors to cause them to come forward and disclose their assets. The discharge was to assure the debtor that afterward he would not be placed in debtors' prison for non-payment of his debts.

Discharge was not related to proof and allowance before the Act of 1898, and it is not in the Code.[24] There was no logical basis for the connection between them in the Act of 1898, which curiously was the first Anglo-American bankruptcy act in which the creditors had not had a right to vote on discharge since 1732.[25] Placing a specific dollar figure on amounts which in all likelihood will never be paid in any event is putting form before substance.

Where a student has dropped out of college without obtaining a degree, the chances that he will ever complete college and go on to teach in a designated school for the needy are so slight as to be disregarded.

### § 439A(a) of the Higher Education Act (20 U.S.C. § 1087–3(a))

§ 439A of the Higher Education Act was amended in 1976 by the addition of subsection (a), which made guaranteed and insured student loans non-dischargeable for five years, except for hardship, and (b) which caused (a) to be applicable to cases filed on and after September 30, 1977. Most cases refer to the amendment as § 1087–3. It is an outgrowth of a study reported by the Bankruptcy Commission in 1973,[26] which had proposed a somewhat similar limitation on discharge in § 4–506(a)(8) of its Bill:

---

22. 283 U.S. 273, 51 S.Ct. 390, 75 L.Ed. 1028 (1931). *Brown v. O'Keefe*, 300 U.S. 598, 606, 57 S.Ct. 543, 548, 81 L.Ed. 827 (1937) expressed the same sentiments,

"What infusion of contingency will vitiate a claim is at best a question of degree . . . though there is a leaning toward allowance in aid of the purpose to relieve the honest debtor."

23. 4 Anne, c. 17 (1705).

24. 11 U.S.C. § 101 et seq.

25. 5 Geo. II, c. 30 (1732).

See: *In re Universal Research Laboratories*, 19 C.B.C. 408 (1978).

26. Report of the Commission on the Bankruptcy Laws of the United States, July, 1973, Part I, pp. 176–77.

§ 4–506

"(a) *Exceptions from Discharge*

A discharge extinguishes all debts of an individual debtor, whether or not allowable except the following:

(8) Any educational debt if the first payment of any installment thereof was due on a date less than five years prior to the date of the petition and if its payment from future income or other wealth will not impose an undue hardship on the debtor and his dependents;"[27]

The arrogance of former students who had received so much from society, frequently including draft deferment, and who had given back so little in return, accompanied by their vehemence in asserting their constitutional and statutory rights, frequently were not well received by legislators and jurists, senior to them, who had lived through the Depression, had worked their ways through college and graduate school, had served in World War II, and had been paying the taxes which made possible the student loans. Among the students who filed bankruptcy petitions in the 1970's, it was commonplace for the student loan to represent a majority in amount of the scheduled debt. In a rather extreme case the Minnesota Supreme Court found that a former law student who was able to pay all other debts and paid nothing on his student loan, which was discharged in bankruptcy, was not of good moral character and should not be permitted to practice law in that state.[28]

The Bankruptcy Commission Bill was not adopted, but in 1976 Congress amended § 439A to provide:

"(a) A debt which is a loan insured or guaranteed under the authority of this part (Part B) may be released by a discharge in bankruptcy under the Bankruptcy Act only if such discharge is granted after the five-year period (exclusive of any applicable suspension of the repayment period) beginning on the date of commencement of the repayment period of such loan, except that prior to the expiration of that five-year period, such loan may be released only if the Court in which the proceeding is pending determines that the payment from future income or other wealth will impose an undue hardship on the debtor or his dependents."[29]

One significant feature of the amendment is "insured or guaranteed under the authority of this part." § 439A(a) did not affect the dischargeability of any student assistance indebtedness other than the insured and guaranteed loans under Part B of the Higher Education Act of 1965. Another significant feature of the amendment is that it made reasonably clear what cases it covered:

"(b) Subsection (a) of this section shall be effective with respect to any proceeding begun under the Bankruptcy Act on or after September 30, 1977."[30]

The only potentially ambiguous aspect of § 439A(b) is whether "proceeding" means case, adversary proceeding, or both. It appears that the section has been interpreted uniformly to mean that § 439A(a) applies only to matters where the petition in bankruptcy was filed on or after September 30, 1977. *In re Brown*[31] involved a Chapter XIII petition filed February 18, 1977 and converted to a bankruptcy proceeding on October 3, 1977. The Court held that the conversion related back to the date of the original filing and that § 439A(a) was not applicable. There was no discussion of the date that the adversary proceeding was started or concluded.

27. H.R. 31, § 4–506(a)(8), 94th Cong., 1st Sess.

28. *In re Gahan*, 279 N.W.2d 826, 5 B.C.D. 512 (Minn.1979).

29. Education Amendments of 1976, § 439A(a), 20 U.S.C. § 1087–3(a).

30. Op.cit. note 29, supra, § 439A(b), 20 U.S.C. § 1087–3(b).

31. *Sherry Ann Brown v. Wisconsin Higher Educational Aids Board*, 4 B.C.D. 207 (E.D.Wis. 1978).

A third interesting aspect of § 439A(a) is that in contrast with § 4–506(a)(8) of the Commission Bill, which put the burden of proving the absence of hardship upon the creditor, § 439A(a) placed the burden of proving the existence of hardship upon the debtor, where it has remained under Bankruptcy Act § 17a(9) and Bankruptcy Code § 523(a)(8).

Among the cases which have found that payment did not constitute a hardship and that consequently the loan was not dischargeable are *Carpenter,*[32] *Ewell,*[33] *Glover,*[34] *Hayman,*[35] *Kirch,*[36] *Macpherson,*[37] and *Mwongozi*[38]; in some cases the decision was that there was a failure of proof on the part of the debtor in his burden to establish hardship. *Sousek*[39] and *Moore*[40] found that hardship existed.

Curiously enough, each of the reported cases has gone all of the way and has held 100% for discharge or 100% for no discharge. Where the issue is hardship, it is surprising that the courts have not said with respect to a $5,000 debt, for example, that it would create a hardship to pay the full $5,000 but no hardship to pay $1,000, thus making the debt non-dischargeable to the extent of $1,000 and dischargeable with respect to $4,000. *Mwongozi* did find the bulk of the debt dischargeable for hardship but $500 non-dischargeable for fraud. There has been no consensus developed as to the degree of severity of the hardship required to constitute "undue hardship."

## REPEAL OF § 439A(a)

For the past fifteen months the principal area of controversy concerning the dischargeability of student loans has been the issue of whether or not § 439A(a) was repealed by the Bankruptcy Reform Act of 1978, and, if it was repealed, what was the effective date of the repeal in terms of its impact upon pending cases. By way of background it will be remembered that the Bankruptcy Reform Act of 1978 had multiple purposes and multiple effective dates and that its passage was in doubt until the final hour. For reasons of expediting the hearing and drafting process, it had been determined that the House bill would be the skeleton of the bill which ultimately would be adopted by both houses after it had been fleshed out to represent a consensus of their views. The legislative history will not be repeated here because it has been described fully to *Kohn*[41] and *Johnson.*[42] The House had favored the discharge of student loans in the same manner as debts generally and consequently the bill contained no provisions for a continuation of a counterpart of § 439A(a). On the other hand the Senate favored nondischargeability of student loans and prevailed upon the House to adopt that view. A mechanical question then arose as to the best method of accomplishing this agreed end in a short period of time.

The method which was adopted was to add a subsection to that part of the proposed Bankruptcy Code which excepted from discharge certain classes of debts, in

**32.** *United States v. Chris Calvin Carpenter,* 5 B.C.D. 577 (D.Colo.1979).

**33.** *Vermont Student Assistance Corp. v. Michael Ewell,* 5 B.C.D. 1041, 1 B.R. 311 (D.Vt. 1979).

**34.** *Pennsylvania Higher Education Assistance Agency v. Kenneth E. Glover,* 4 B.C.D. 876 (E.D.Pa.1978).

**35.** Op. cit. note 16, supra.

**36.** Op. cit. note 14, supra.

**37.** *Wisconsin Higher Educational Aids Board v. Julie A. Macpherson,* 4 B.C.D. 950 (W.D.Wis. 1978).

**38.** Op. cit. note 18, supra.

**39.** *In re Sousek,* 5 B.C.D. 967 (E.D.Wis.1979).

**40.** *New York State Higher Educational Services Corporation v. Nora J. Moore,* 4 B.C.D. 791 (W.D.N.Y.1978).

**41.** *New York State Higher Educational Services Corporation v. Anthony Kohn,* 5 B.C.D. 419 (S:D.N.Y.1979).

**42.** *Pennsylvania Higher Education Assistance Agency v. Deborah Lee Johnson,* 5 B.C.D. 532 (E.D.Pa.1979).

concept and in format similar to the exceptions to discharge which have been contained in § 17a of the Bankruptcy Act. It was a relatively simple procedure to add subsection (8) to the existing seven types of non-dischargeable debts which already were in place as subsections to § 523(a). Necessarily § 523(a)(8) could not become operative until the entire Code became operative because § 523(a)(8) had become an integral part of the whole structure. Thus, it was recognized by everyone that § 523(a)(8) would not become effective until October 1, 1979.

A secondary purpose of the Bankruptcy Reform Act, partly stylistic, partly functional, was to remove bankruptcy related laws from some three dozen miscellaneous statutes and to codify substantive bankruptcy law in one place and under its own title in the United States Code. To have permitted § 439A(a) to continue to exist after § 523(a)(8) became effective would have disrupted the planned symmetry of the Bankruptcy Code. In addition, there would have been two laws limiting the dischargeability of student loan debts; one within the Code and one without; one applying to all student loans and the other applying only to insured and guaranteed loans; one based upon the nature of the loan and the other geared to the nature of the current creditor. Thus it was axiomatic that § 439A(a) should be repealed. The principle was so fundamental and so universally recognized that probably there was little discussion about it; that was a matter which could be left to the technicians.

The Bankruptcy Reform Act of 1978 (P.L. 95–598) consisted of four separate but related titles:

1. Title I—*Enactment of Title 11 of the United States Code*

   This title commonly is referred to as the Bankruptcy Code and became effective October 1, 1979;

2. Title II—*Amendments to Title 28 of the United States Code and to the Federal Rules of Evidence*

   This title took the composition of bankruptcy courts away from miscellaneous statutes and placed it with the Judicial Code. With the exception of a number of minor technical revisions or changes in terminology which became effective on enactment at November 6, 1978, or on the effective date of the Code, Title II becomes effective April 1, 1984;

3. Title III—*Amendments to Other Acts*

   For the most part this title consists of amendments, technical in nature, to about thirty other acts, designed to keep bankruptcy legislation consistent with other continuing laws. As a part of a design to have substantive bankruptcy questions defined in the Bankruptcy Code, it repealed bankruptcy related provisions appearing in other acts and in the Revised Statutes. For the most part Title III became effective October 1, 1979, except for some provisions respecting retirement programs for bankruptcy judges, and

   (a) § 317 which repealed § 439A of the Higher Education Act,

   (b) § 327 which repealed a portion of the Public Health Service Act, and

   (c) § 328 which repealed a portion of the Social Security Act.

4. Title IV—*Transition*

   The first three sections of this title are the only portions which relate to the issue before the Court. (Section 403 will be discussed later in the opinion).

   (a) Section 401 repeals the Bankruptcy Act and a number of acts amendatory to it, plus a section of the Interstate Commerce Act respecting railroad reorganizations;

   (b) Section 402 is the crucial axis about which the issue of effective dates revolves and is composed of four subsections:

      (i) Subsection (a) provides that except as otherwise provided within Title IV the entire Bankruptcy Reform Act becomes effective October 1, 1979;

(ii) Subsection (b) provides that Title II (relating to the Court structure) shall become effective April 1, 1984, except as provided in subsections (c) and (d);

(iii) Subsection (c) provides that 15 enumerated sections shall take effect on October 1, 1979.

(iv) Subsection (d) provides that 11 enumerated sections shall take effect on the date of enactment.

It is conceded universally that it was by mistake that § 317 of the Reform Act, which repealed § 439A of the Higher Education Act, became effective upon passage and not at October 1, 1979. If there ever has been an official explanation of how the mistake was made, it has not come to the attention of this Court, but nevertheless we presume that the scenario was somewhat as follows:

1. After it was determined that the structure of the House bill would have to be modified to accommodate the Senate's views on student loan non-dischargeability, a question arose as to the simplest method of accomplishing it;

2. There were in the Reform Act two subsections for accommodating effective dates which were contrary to the basic effective dates of October 1, 1979, for substantive matters and April 1, 1984, for judicial revisions, namely § 402(c) and § 402(d);

3. All of the 15 subsections enumerated in § 402(c) were in the 200 series, which was the designation of Title II matters;

4. Of the 10 subsections in § 402(d) four were in the 200 series (Title II), five were in the 300 series (Title III), and one was in the 400 series (Title IV);

5. In the last minute rush a staff member presumed that § 317 belonged in § 402(d) with the other sections in the 300 series, and not in § 402(c) with all of the 200 series sections;

6. Neither that staff member nor anyone else noted at that time that § 402(c) was effective October 1, 1979, and § 402(d) was effective upon enactment.

Section 317 provides as follows:

"Sec. 317. Section 439A of part B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087–3) is repealed."

As enacted, Section 402(d), where § 317 is, provides as follows:

"(d) The Amendments made by sections 217, 218, 230, 247, 302, 314(j), 317, 327, 328, 338 and 411 of this Act shall take effect on the date of enactment of this Act."

Section 402(c), where § 317 should have been placed, reads:

"(c) The Amendments made by sections 210, 214, 219, 220, 222, 224, 225, 228, 229, 235, 244, 245, 246, 249, and 251 of this Act shall take effect on October 1, 1979."

Since the Reform Act was adopted, bankruptcy courts have taken three different approaches in dealing with what they recognize as being a mistake made by Congress. The easiest to understand, but the most difficult to support juristically, is that the mistake should be disregarded, which is the view of *Henry*[43] and *Kohn*.[44] The first flaw is the argument that Congress did not intend to repeal § 439A. That premise is answered by *King*[45] as follows:

"There can be no doubt that the [Bankruptcy Reform] Act intentionally included such repeal, it being the intention that 20 U.S.C. § 1087–3 be replaced by § 523(a)(8) of [the Code]. Congress simply slipped up in not dovetailing the effective dates of these two provisions."

A second flaw is in going behind the written word, which is not a question of interpretation but rather of changing the writing from what it says. The parol evidence rule, the Statute of Wills, the Statute of Frauds, and innumerable decisions support the principle that a court should not vary a writing, should not go behind minutes of meetings and laws as passed.

43. *New York State Higher Education Services Corporation v. Yvonne Henry*, 1 B.R. 295, 5 B.C.D. 1014 (S.D.N.Y.1979).

44. Op. cit. note 41, supra.

45. *State of Ohio v. Joseph King, Jr.*, 5 B.C.D. 417 (S.D.Ohio 1979).

The third flaw is that in the system of government in force in this country there is a legislative branch to make laws and a judicial branch to resolve issues arising under those laws. A good argument could be made that the courts could legislate better than the legislatures, but that is not the way the country was established. Congress knew of its mistake and ultimately corrected it. It was Congressional policy not to correct it immediately, and the matter was within the Congressional area of responsibility.

There were two other mistakes written into § 523(a)(8) of the Code which were plugged by P.L. 96–56 at the same time that it amended § 17a by adding subsection (9). (For the text see footnote 78, infra). It is this Court's guess that neither of these other mistakes would have been caught and corrected prior to the effective date of the Code on October 1, 1979, if it had not been for the obvious mistake in repealing § 439A(a) prematurely. The reason for this assertion is that other mistakes in the Code have not yet been corrected by Congress.

The second mistake would have had greater economic significance than the premature repeal of § 439A(a). As enacted § 523(a)(8) provided:

"§ 523(a) A discharge . . . does not discharge an individual debtor from any debt—

(8) to a governmental unit, or a nonprofit institution of higher education, for an educational loan, unless—

(A) such loan first became due before five years before the date of the filing of the petition . . ."

Direct loans normally were made by colleges or universities, or their affiliates, but occasionally were made by nonprofit foundations which were not themselves institutions of higher education. Insured and guaranteed loans normally were made by commercial banks, savings banks, savings and loan associations, credit unions, but frequently were made by affiliates of colleges and universities or by agencies of the states. The mechanical process of federal or state agencies in their reimbursing of the original lenders on defaulted loans is such that more than one year will elapse from the time that the student leaves school until the governmental agency will have made good on the insurance or guarantee and will have been subrogated to the original lender. Thus under § 523(a)(8) as enacted, if the student filed his petition in bankruptcy within one year of leaving college, his debt would have been discharged if the original lender had been a commercial institution or a foundation.

The third mistake was in not recognizing the grace period which had been established in the middle 1960's by student assistance legislation to cause the repayment date to be extended for the period of time that the former student served in the Armed Forces, the Peace Corps or Vista. These other acts were not repealed by the Bankruptcy Reform Act; private lenders are not reimbursed by governmental agencies until their debts have been in default for 120 days; and prescribed service in the Armed Forces, Peace Corps and Vista suspends the due date on the debt. This would have given the former student an extended period to have his student loan discharged, provided that he was in the prescribed service and the original lender was a commercial entity or a foundation not affiliated with a college or university.

The Congress did act to correct all three mistakes, and it is the view of this Court that had it not the Courts should not have engaged in remedial legislation on their own. In disregarding the words of a statute, a court is not, in fact, changing the statute; all that it is doing is creating an abnormal situation within its own jurisdiction.

## § 403(a) and § 402(a)

A second class of cases dealing with the repeal of § 439A has held that the gap previously referred to of having § 439A be repealed on November 6, 1978, and § 523(a)(8) not become effective until October 1, 1979, was closed effectively by the savings provisions of § 403(a) of the Reform Act, which reads:

"A case commenced under the Bankruptcy Act, and all matters and proceedings in or relating to any such case, shall be conducted and determined under such act as if this act had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the Act had not been enacted." (underscoring supplied)

The reasoning went that if the Bankruptcy Reform Act had not been enacted, § 439A would not have been repealed and would have continued. *Elson*,[46] *Erickson*,[47] *Piccione*[48] and *Weinstein*[49] follow that theory. The answer to that argument is that Section 402 determines the effective dates of all of the sections of the Bankruptcy Reform Act, and under § 402(a) § 403 did not itself become effective until October 1, 1979. Thus it was unable to save anything before that date because it was not operative itself. That reasoning, which this Court believes is correct, is found in *Christopher*,[50] *King*,[51] *Sawaya*,[52] and *Utterback*.[53] *Payton*[54] and *Vittek*[55] reached the unusual conclusion that the Bankruptcy Reform Act amended the Bankruptcy Act by implication and that in effect § 523(a)(8) became § 17a(9).

### OPERATIVE DATES OF § 439A(a)

Most of the cases accepted the repeal of § 439A(a) by the Bankruptcy Reform Act and were concerned with the periods when § 439A was controlling. The commencement was not difficult because § 439A(b) provided:

"(b) Subsection (a) of this section shall be effective with respect to any proceeding begun under the Bankruptcy Act on or after September 30, 1977."

Questions arose with respect to cases commenced after September 30, 1977 and pending after November 6, 1978, which will be considered after an overview of the whole problem.

If this were a perfect society, there would be no disputes. If it were a slightly imperfect society, any dispute which might arise would be determined on the basis of the law that existed at the time of the occurrence of the events which produced the dispute, which we may call transactional orientation. The difficulties of that proposition in a society as litigious as ours should be readily apparent.

The delays in attaining trials which exist today would be multiplied many fold if the courts and the lawyers were unable to rely upon contemporary laws with which they are familiar and had to research, brief, argue and decide cases upon the basis of laws which had been superseded in some manner. The complexity of the problem would be increased geometrically if the factual situation were such that several transactional orientations were required.

Where multiple party disputes arise, such as in a bankruptcy case, it would be virtually impossible to have one law apply to one group of creditors and another law to a second group of creditors, particularly is this so because the fundamental principle of

**46.** *Wisconsin Higher Education Aids Board v. Allan Curtis Edson*, 4 B.C.D. 1191 (D.Nev. 1979).

**47.** *Wisconsin Higher Education Aids Board v. Kirsten J. Erickson*, 5 B.C.D. 734 (E.D.Wis. 1979).

**48.** *Connecticut Student Loan Foundation v. Camelo Piccione*, 5 B.C.D. 1076 1 B.R. 364 (D.Conn.1979).

**49.** *Pennsylvania Higher Education Assistance Agency v. Mark S. Weinstein and Linda W. Weinstein*, 5 B.C.D. 503 (E.D.Pa.1979).

**50.** *In re Christopher*, 5 B.C.D. 214 (W.D.N.Y. 1979).

**51.** Op. cit. note 45, supra.

**52.** *Massachusetts Higher Education Assistance Corporation v. Sawaya*, 2 B.R. 37, 5 B.C.D. 1072 (D.Mass.1979).

**53.** *Wisconsin Higher Educational Aids Board v. Utterback*, 1 B.R. 199, 5 B.C.D. 1046 (N.D.Tex. 1979).

**54.** *In re Payton*, 4 B.C.D. 976 (E.D.Pa.1978).

**55.** Op. cit. note 7, supra.

bankruptcy law is that creditors are to be treated alike. Thus, from a pragmatic viewpoint, it is essential for courts to base their decisions upon laws which are contemporary, or nearly so, which may be called a juridical orientation.

A juridical orientation permits a choice of times as of which the law shall be determined—from the filing of the complaint to the entry of judgment. In a bankruptcy setting logical way stations which might be adopted as the decisive time determinant are:

(a) date of filing bankruptcy petition,

(b) date of discharge,

(c) date of filing of dischargeability complaint or motion to dismiss,

(d) date of trial,

(e) date that last brief is due, or

(f) date of court decision.

To this Court's thinking (d), (e) and (f) are unacceptable because they are subject to manipulation by the parties. For example, there was a general feeling throughout 1979 that a technical amendment bill would be adopted which would be a substitute for the repealed § 439A. If (d), (e) or (f) had been known to be the determinants, there would have been a great incentive for the lenders and the assignees of the lenders to delay matters and stretch them out so that the trial, or the brief, or the decision would come after the effective date of the non-dischargeability amendment, which was August 14, 1979. The same reasoning applies to a slightly lesser extent to having date of discharge be the juridical determination date. College students tend not to keep accurate records of their personal finances and a sophisticated lender could have filed a Section 14 complaint respecting discharge, which would have delayed the issuance of the discharge.

An added cause for concern about (f) is that this Court and obviously a number of other bankruptcy courts accumulated their student loan cases so that they might render a single opinion which would govern a number of cases. With respect to each case except the last case, this is an arbitrary decision which will affect the result but which has no relationship to that particular case. Another similar arbitrary decision on the part of the judge might be to put student loan cases at the bottom of the pile until he had disposed of his Chapter XI cases, or for other reasons. This also would delay the date of decision and make new law applicable to a case which logically should have been decided the opposite way previously and would have been if it had been decided promptly. Thus the only juridical options which are relatively free from being affected by tampering or whim are:

(a) date of filing bankruptcy petition, and

(b) date of filing dischargeability complaint or motion to dismiss.

Because the date of the filing of the petition in bankruptcy is the critical date in most respects in bankruptcy cases, the Court submits that it should be here also. The date that the petition is filed:

(a) is the debt-asset measuring date to determine insolvency,

(b) is the date as of which debts are discharged,

(c) is the date for determining which debts are discharged,

(d) is the date for determining which debts may be proven,

(e) is the date from which priorities are measured,

(f) is the date from which preferences are measured,

(g) is the date from which the trustees rights are measured,

(h) is a determining date respecting transfers in defraud of creditors,

(i) is a base date for establishing a claim period, and

(j) other examples could be given.

A plurality of the bankruptcy cases which have selected a date of determination of what law is to be applied have chosen date of the filing of the petition, including

*Brown*,[56] *Carpenter*,[57] *Erickson*,[58] *Kirch*,[59] *Sawaya*,[60] *Taylor*,[61] and *Weinstein*.[62] Some of them relied on favorable United States Supreme Court language, ". . . rights of creditors are fixed by the Bankruptcy Act as to the filing of the petition in bankruptcy. This is true both as to the bankrupt and among themselves."[63] The issue in that case, however, and in several Court of Appeals cases cited on the general issue is whether a transactional or juridical orientation should apply.[64] Both courts favored a juridical orientation and were not focusing on which of the juridical options was most suitable.

*Payton*[65] and *Piccione*[66] appear to believe that the law on the date of discharge should control, and *Amadori*,[67] *Espronceda*,[68] *Henry*,[69] *Johnson*,[70] and *Utterback*[71] appear to prefer the date of the decision on the dischargeability complaint. The cases on which they rely, with the exception of four, would have achieved the same result no matter which juridical option was chosen—the issue really was a transactional or juridical orientation. All of the cases were pre-1970 cases which in all probability would now be raised under § 17 but at that time raised the issue of discharge of a specific debt under § 14 as an objection to discharge. The frequently quoted language from *In re Seaholm*,[72] "There was no vested right in the bankrupt to have the law

stand as it was" was speaking of a transaction five years before the petition was filed and an amendment to the law which became effective two years before the petition was filed.

The four cases in which the law changed after the filing of the petition in bankruptcy will be discussed briefly. In *Dreyfuss Dry Goods v. Morgan*,[73] the amendment took effect after the filing of the petition and after the hearing by the referee in bankruptcy but before his report. In going for the early option, the court said,

> "To say the least, it does not clearly appear from the language of [the] act that its provisions were intended to govern proceedings under an application for discharge which was filed and opposed by allegations and proofs before the act was passed."

In *Lockhart v. Edel*[74] there was a five year lag between the filing of the petition in bankruptcy and the granting of the discharge. The amendment in question was passed nearly four years after the petition was filed, but the court held that it was applicable, saying,

> "the amendment . . . which we think applies because in force at the time the judge below passed on the question of discharge."

56. Op. cit. note 31, supra.

57. Op. cit. note 32, supra.

58. Op. cit. note 47, supra.

59. Op. cit. note 14, supra.

60. Op. cit. note 52, supra.

61. *New York State Higher Educational Services Corporation v. Robert N. T. Taylor*, 19 C.B.C. 632 (D.Maine 1978).

62. Op. cit. note 49, supra.

63. *United States v. Marxen*, 307 U.S. 200, 207, 59 S.Ct. 811, 815, 83 L.Ed. 1222 (1938).

64. *In re Seaholm*, 136 F. 144, 147 (1 Cir. 1905); *In re Carter*, 32 F.2d 186 (2 Cir. 1929).

65. Op. cit. note 54, supra.

66. Op. cit. note 48, supra.

67. *Rodney A. Amadori v. New York State Higher Education Service Corporation*, 5 B.C.D. 187 (W.D.N.Y.1979).

68. *Coordinating Board, Texas College and University System v. Defina Espronceda*, 5 B.C.D. 267 (S.D.Tex.1979).

69. Op. cit. note 43, supra.

70. Op. cit. note 42, supra.

71. Op. cit. note 53, supra.

72. Op. cit. note 64, supra.

73. *Dreyfuss Dry Goods v. Morgan*, 23 F.2d 54, 55 (5 Cir. 1927).

74. *Lockhart v. Edel*, 23 F.2d 912, 913 (4 Cir. 1928).

*In re Sloss*[75] involved an amendment which was adopted five months after the petition in bankruptcy was filed and five months before the discharge was granted. The Court added a new dimension of Congressional motivation,

"Since the purpose of the amendment was to liberalize the existing law, in the absence of Congressional intent to the contrary, there is added reason to make it applicable as of the date of the determination, particularly so when an amendment unfavorable to a bankrupt by creating new grounds barring a discharge, has been held applicable."

Applying the amendment caused the discharge to be entered, whereas it would not have been otherwise.

*Royal Indemnity Co. v. Cooper*[76] presented the same amendment to § 14(a) of the Bankruptcy Act as was the core issue in *Lockhart v. Edel.* For our purposes the difference is that *Lockhart* represents a choice between transactional and juridical orientation, whereas *Royal Indemnity* represents an election among juridical options because the amendment became effective after the petition in bankruptcy was filed. Both cases held that the discharge date was controlling.

Possibly the strongest argument for using the date of filing of the petition as the determination date is that it is the date which Congress has selected when it has spoken on the subject. Subsection (b) of the section imposing nondischargeability provides,

"Subsection (a) of this section shall be effective with respect to any proceeding <u>begun</u> under the Bankruptcy Act on or after September 30, 1977."[77] (underscoring supplied).

Section 2 of the Act which reinstated non-dischargeability provides:

"Sec. 2. The amendments made by section 1 shall apply with respect to any proceeding <u>commenced</u> under the Bankruptcy Act during the period beginning on the date of enactment of this Act and ending October 1, 1979."[78] (underscoring supplied).

If the filing of the petition is to be the determinant with respect to the imposition of the limitation, it is logical to have it be the determinant with respect to the removal of the limitation.

The savings provision of the Bankruptcy Reform Act uses the same approach:

"Sec. 403(a). A case <u>commenced</u> under the Bankruptcy Act . . . shall be conducted . . ."[79] etc. (underscoring supplied).

Any one of the sections might have spoken in terms of "pending", but they all spoke in terms of "begun" and "commenced." The way a bankruptcy proceeding is "begun" or "commenced" is the filing of a petition.

As stated in *Carpenter,*

"The determination must be made as to the substantive law which was applicable

**75.** *In re Sloss*, 192 F.Supp. 136 (S.D.N.Y.1961).

**76.** *Royal Indemnity Co. v. Cooper*, 26 F.2d 585 (4 Cir. 1928).

**77.** · Op. cit. note 30, supra.

**78.** P.L. 96–56, 93 Stat. 387, 96th Cong. effective August 14, 1979.

The form which the amendment took was to add subsection (9) to § 17a of the Bankruptcy Act (11 U.S.C. § 35a(9)).

"§ 17a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as

(9) * for a loan insured or guaranteed under

* The verb "are" was omitted, apparently inadvertently.

the authority of part B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1071 et seq.) unless:

(a) the discharge is granted after the five-year period (exclusive of any applicable suspension of the repayment period) beginning on the date of the commencement of the repayment period of such loan, or

(b) the discharge is granted prior to the expiration of such five-year period and the court determines that payment from future income or wealth will impose an undue hardship on the bankrupt of his dependents."

Section 3 of the amendment corrected the two mistakes referred to above at pp. 85–86.

**79.** Bankruptcy Reform Act of 1978, § 403(a).

at the time of the filing of the bankruptcy petition, as it alone governs the rights of the parties." [80]

## GENERAL SAVINGS STATUTE
## (1 U.S.C. § 109)

The general savings statute provides in part as follows:

"The repeal of any statute shall not have the effect to release or extinguish *any penalty, forfeiture, or liability* incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of *such penalty, forfeiture, or liability . . .*"

■ An argument occasionally was made by the guarantors of the student loans that the repeal of § 439A did not extinguish the liability on the debt. The argument was considered in *Adamo,*[81] *Carpenter,*[82] *Christopher,*[83] *Edson,*[84] *Henry,*[85] and *Utterback,*[86] and in all instances it was decided that the liability was not one which had been created by the repealed statute, but rather had been created by the voluntary act of the student in signing the promissory note upon which the claim was based. Consequently, the general savings statute did not negate the repeal of § 439A by the Bankruptcy Reform Act.

## HARDSHIP

*Moore*[87] and *Sousek*[88] found debts to be dischargeable because of hardship. *Carpenter,*[89] *Ewell,*[90] *Glover,*[91] *Hayman,*[92] *Kirch*[93]

and *Macpherson*[94] either found that there was no hardship, or that hardship had not been proven, and that the debt was non-dischargeable. None of them split the debt between dischargeable and non-dischargeable portions with the requirement that the amount that could be repaid without hardship should be non-dischargeable.

## STATEMENT OF FACTS

Geneva Bruce (hereinafter "Bruce") attended Southern Illinois University (hereinafter "the University") at Carbondale, Illinois during the years 1970–1972. She received six advances totalling $1,450 on which she had made no repayments prior to filing a petition for an arrangement under Chapter XIII of the Bankruptcy Act. Unpaid interest of $220 brought the debt to $1,670 at the time that her petition was filed on May 8, 1978. The original plan was found by the Court to be deficient, but an amended plan was confirmed July 18, 1978. There was a broad range of creditors, to whom a total of $9,025.60 was scheduled as being owed. Bruce became unemployed and on May 31, 1979, filed a petition to be adjudicated a bankrupt, having paid only $338.19 into the plan, exclusive of her attorney's fees, although the plan called for payments of $185 per month. She was declared a bankrupt on May 31, 1979.

The loan which Bruce received was a direct loan from the University under the National Defense Student Loan Program. A copy of the promissory note, dated September 30, 1970, showing advances scheduled, was filed as a claim and was allowed

80. Op. cit. note 32, supra.

81. *New York State Higher Education Services Corporation v. Paul R. Adamo,* 20 C.B.C. 194 (W.D.N.Y.1979).

82. Op. cit. note 32, supra.

83. Op. cit. note 50, supra.

84. Op. cit. note 46, supra.

85. Op. cit. note 43, supra.

86. Op. cit. note 53, supra.

87. Op. cit. note 40, supra.

88. Op. cit. note 39, supra.

89. Op. cit. note 32, supra.

90. Op. cit. note 33, supra.

91. Op. cit. note 34, supra.

92. Op. cit. note 16, supra.

93. Op. cit. note 14, supra.

94. Op. cit. note 37, supra.

(which by itself would torpedo the University's current contention that it is not allowable under § 57d). Apparently Bruce never was employed in any of the public service capacities which would have provided cancellation benefits under the Elementary and Secondary Education Act of 1965 (20 U.S.C. § 1821, et seq.) or the Economic Opportunity Act of 1964. (42 U.S.C. § 2902 et seq.).

On August 8, 1979, the University filed a complaint to determine the dischargeability of its debt under Bankruptcy Rule 701(7) on the ground that the debt is not allowable under § 57d of the Bankruptcy Act. About one year previously the debt had been allowed in the Chapter XIII proceeding. The complaint was followed by a motion for summary judgment filed October 17, 1979. A hearing on the motion was held November 19, 1979, at which no evidence was offered, and the case was taken under advisement on the pleadings and briefs.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court finds that there is presently due and owing to the University the sum of $1,670 for principal and interest on advances made to Bruce under the National Defense Student Loan Program, which was a direct loan by the University to Bruce and which was not insured or guaranteed by any federal agency or by any other agency which would be reimbursed with federal funds.

The Court further finds that the dates and amounts of the loans from the University to Bruce were:

| | |
|---|---|
| September 14, 1970 | $ 250 |
| December 21, 1970 | 375 |
| March 18, 1971 | 375 |
| September 20, 1971 | 150 |
| December 14, 1971 | 150 |
| March 16, 1971 | 150 |
| | $1,450 |

The Court holds that under the provisions of § 403(a) of the Bankruptcy Reform Act of 1978 this case is governed by the Bankruptcy Act of 1898.

The Court also holds:

(a) that the Bankruptcy Act of 1898 did not impose any limitations on the discharge of direct student loans, either before or after the addition of subsection (9) to § 17a, effective August 14, 1979, and

(b) that § 439A of the Higher Education Act of 1965 did not at any time impose any limitations on the discharge of direct student loans.

The Court further holds that the debt owed to the University, evidenced by a promissory note, is "a fixed liability . . . evidenced by . . . an instrument in writing" and is provable under § 63a(1) of the Bankruptcy Act. The claim was filed pursuant to § 57b and was allowed. As a provable debt allowed in full it is dischargeable under § 17a because it has no disqualifications.

 IT IS ORDERED THAT the debt of Bruce to the University is discharged.